IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MIKAYLA AVERY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:20-cv-2168 |
| v. | § | ECF |
| | § | |
| ARCHIVAL MAGAZINE, LLC, | § | |
| ARCHIVAL INSTITUTE, LLC, | § | |
| THE GARZA LEGAL GROUP, GARZA | § | |
| & HARRIS, LTD, and JOE B. GARZA | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

NOW COMES Plaintiff, Ms. Mikayla Avery, and files this, her Original Complaint, and respectfully shows the following:

**I. PARTIES**

1. Plaintiff Mikayla Avery is an individual who resides in Travis County, Texas.

2. Defendants Archival Magazine, LLC and Archival Institute, LLC are both domestic limited liability company that can be served through its registered agent, Shannon Niehus, at 13155 Noel Rd, Ste. 2400, Dallas, TX 75240

3. Defendants The Garza Legal Group and Garza & Harris, Ltd are both domestic limited liability companies that can be served through their registered agent Joe B. Garza at 13155 Noel Rd., Suite 2300, Dallas, TX 75240.

4. Defendant Joe B. Garza is an individual that can be served personally at 13155 Noel Rd., Suite 2300, Dallas, TX 75240

## II. JURISDICTION AND VENUE

3. Personal jurisdiction is proper because all Defendants operate principal places of business in Dallas County, Texas. An exercise of jurisdiction will not offend traditional notions of fair play and substantial justice.

4. Venue is appropriate in the Northern District of Texas because the acts giving rise to this suit occurred in Hunt County, Texas.

## III. FACTS

5. Ms. Avery first started working at Archival Magazine as a freelancer in 2012. Archival Magazine is now called the Archival Institute.

6. A year later, she was hired a full time as the Creative Director.

7. Her supervisor for the duration of her employment was Ms. Shannon Niehus, the CEO of Archival Magazine and now CEO of Archival Institute.

8. Ms. Avery's paychecks were issued by Garza & Harris through Joe B. Garza. Garza & Harris has since become The Garza Legal Group.  Joe B. Garza is the principal partner of both firms

9. From 2012 until her termination, Ms. Avery went by the name of Michael Knapp.

10. Although Knapp never received any formal performance evaluations, no negative things were ever said about Knapp's performance.

11. In fact, Knapp received two substantial raises and a bonus.

12. Then in September 2016, Knapp began Hormone Replacement Therapy. Unfortunately, when that happens, Archival through Ms. Niehus began to discriminate and harass her.

13. At the beginning of October, Ms. Avery, formerly known as Michael Knapp, changed the way she dressed.

14. For the past four years Knapp had dressed in a stereotypically male fashion.

15. Ms. Avery started wearing bright shoes and nail polish, which is more stereotypically female attire.

16. On October 24, Ms. Avery and Ms. Niehus had an argument about what would happen to LGBT+ rights if Donald Trump became president.

17. During that time, Ms. Avery was subjected to many transphobic remarks from Ms. Niehus.

18. For example, when Ms. Avery pitched a documentary film about transgender issues as part of her job as Creative Director, Ms. Niehus called transgender people "freaks," said she "wouldn't want to go to the bathroom" with them, and that such people are "mentally disturbed."

19. In November, Ms. Avery began wearing women's jeans, jewelry, and tighter shirts. Many co-workers complimented her. Ms. Niehus and Mr. Garza were not among them.

20. After Trump became president, Ms. Niehus made a point of telling Ms. Avery that all interviews for their films should be conducted at Trump-owned hotels.

21. At the same time, Ms. Niehus also told other employees not to provide essential information to Ms. Avery that she needed to perform her job.

22. Specifically, Ms. Niehus told employees that information was to only pass through her and not Ms. Avery.

23. Additionally, Ms. Niehus did not tell Ms. Avery, the creative Director, about important meetings regarding storyboarding and budgets for projects.

24. Other coworkers noticed that Ms. Niehus was intentionally withholding information from Ms. Avery. One coworker stated:

> -She made a decision to take her power and didn't let him to attend in our project for brainstorming and planning and by this way kept him away from important information for documentary. Also every day she used to change her plan and making Mikayla so confuse.
>
> Once she controlled the information, Mikayla became unable to plan for projects for a long time or direct the teams properly but Mikayla still tried so hard to make the projects successful while do her job while trying to fill in the blanks from missing information.

25. In December, Ms. Avery discovery that Archival had cancelled her health insurance back in October, shortly after Ms. Avery started transitioning. Only after Ms. Avery complained was it reinstated.

26. Prior to Ms. Avery transitioning, Mr. Garza would send potential employees to Ms. Avery's office so that they could see what projects Archival was working on. In December, Mr. Garza stopped taking potential employees to Ms. Avery's office.

27. On December 16, 2016, Mr. Garza and Robbie Christopher were talking in the break room about Ms. Avery's health insurance. One of them stated, "I can't believe we are paying for that." Ms. Christopher is the CEO of The Pension Company and oversaw benefits and payroll for Archival as well as Garza & Harris.

28. When Ms. Avery went on vacation between New Years and Christmas, Ms. Niehus searched Ms. Avery's office.

29. On December 23, 2016, everyone in the office was given a raise except Ms. Avery.

30. When Ms. Avery returned from vacation, she discovered that Archival and Garza had changed the locks to her office.

31. Mr. Garza then took Ms. Avery into a conference room and fired her for performance.

32. As stated above, during her entire 5-year period with Archival Magazine, Ms. Avery had never been made aware of any performance issues.

33. Coworkers witnessed Ms. Niehus treating Ms. Avery differently as she transitioned and no longer conformed to gender stereotypes.  For example, according to one coworker:

> When Mikayla had earrings and nail polish, I observed Shannon try to start dominating her in every aspect and push her back from every chance in her role as creative director. This would grow progressively worse the more changes that occurred. Most days they (Mikayla & Shannon) had long meetings over 2 hours and later Shannon didn't give her any chance in the group meeting to speak about her views. Sometimes if Mikayla was speaking in the meeting Shannon would get angry and would try to silence her through angry reactions. This was a big change as Shannon used to let Mikayla speak freely and organize everything. Before Mikayla would give us instructions and then Shannon would just fix it up to her taste but then eventually Shannon tried to foster blame on Mikayla for things that she had nothing to do with. Shannon's reactions would grow more irate the more Mikayla's appearance changed. Shannon used to never treat Mikayla this way and seemed to be actively trying to make her quit.

34. One meeting stood out in particular to this coworker:

> One meeting stood out in particular to me. Very aggressively Shannon told every one we didn't have any bosses starting tomorrow and in this company everybody can be in every position! But in actuality she made herself director. Shannon actively would try to crush Mikayla's character in front of others and without any logical reason or official letter, she took Mikayla's position away this way. She would then take every opportunity to try to show others that Mikayla is a bad director when no one was seeing it or understanding why Shannon would take this position. She use to never treat Mikayla this way but once some of the changes were either noticed or someone commented on them, the more abusive Shannon's language became and the more she tried to hamstring Mikayla's job.

35. Since Ms. Avery's termination, she has searched for a job.  However, Ms. Niehus retaliated against her by giving bad references to employers.

36. On April 7, 2017, Ms. Avery filed a charge of discrimination with the EEOC and the City of Dallas Fair Housing Office.  After Investigation, the Fair Housing office recommended that Defendants be prosecuted for violation of the City ordinance prohibiting discrimination against transgendered individuals.  However, the District Attorney's Office declined to bring suit, which is unsurprising because the District Attorney's Office has never brought suit to enforce violations of that ordinance.

37. On July 17, 2020, Ms. Avery requested a right to sue.  On July 27, 2020, she received it.

38. All conditions precedent to the bringing of this lawsuit have been satisfied and fulfilled.

### IV. TITLE VII SEX DISCRIMINATION CLAIM

39. Ms. Avery realleges and incorporates all of the above paragraphs as if restated herein.

40. Defendants' action in terminating Ms. Avery's employment constitutes sex discrimination.

41. The first element of the prima facie case is that Ms. Avery belonged to a protected class. Ms. Avery is a transgender individual who during the relevant period of this case transitioned from male to female.

42. Discrimination based on transgender status is sex discrimination prohibited by Title VII. *See Bostock v. Clayton County, Georgia*, No. 17-1618, --- U.S. --- (2020)

44. The second element of the prima facie case is that Ms. Avery was qualified for the position. Ms. Avery worked as the creative director at Archival from 2013 until 2017, received raises and bonuses. She never received a negative performance review.

45. The third element of the prima facie case is that Ms. Avery suffered an adverse employment action. Defendants terminated Ms. Avery.

46. The fourth element is that Defendants treated Ms. Avery less favorably than others similarly situated but outside the protected class.

   a. On information and belief, Defendants replaced Ms. Avery with an employee who was not transitioning or transgendered, but rather adhered to gender stereotypes.

   b. Other similarly situated employees were not treated in the same manner as Ms. Avery.

61. Defendants' stated reason for termination was performance.

62. Ms. Avery casts doubt on the stated reasons because, as shown above, among other things, Ms. Avery never had a bad performance review or was put on a performance improvement plan. In fact, Ms. Avery received raises and bonusses for her work. Further, as shown above, Ms. Avery was treated differently than other employees.

## V. RETALIATION

65. Ms. Avery realleges and incorporates all of the above paragraphs as if restated herein.

66. Defendants violated Title VII of the Civil Rights Act when it retaliated against Ms. Avery for her opposition to sex discrimination.

66. Ms. Avery engaged in protected activity when she expressed opposition to Defendants' discrimination and hostility towards transgendered individuals as well as when she began transitioning.

68. Defendants retaliated against and ultimately terminated Ms. Avery because of her protected activity.

69. As described above, Ms. Avery casts doubt on Defendants stated reason for termination.

70. Because of the Defendants' actions, Ms. Avery has suffered damages within the jurisdictional limits of this Court.

## VI. JURY DEMAND

71. Plaintiff exercises his right to trial by jury.

## VII. DAMAGES

72.     WHEREFORE, Ms. Avery respectfully requests that the above-named Defendants be cited to appear in this matter and that, after jury trial by proof, she be awarded:

  i. All economic damages, including but not limited to, lost wages, back pay, front pay, and other employment benefits;

  ii. All noneconomic damages, including but not limited to, compensatory damages for mental anguish, emotional distress, and loss of enjoyment of life;

  iii. Punitive damages in the maximum amount allowed by law;

  iv. Judgment against Defendants for Plaintiff's reasonable attorneys' and experts' fees, and costs of suit;

  v. Pre- and post-judgment interest as allowed by law; and

  vi. Such other and further legal and/or equitable relief to which Plaintiff may be justly entitled, as this court may deem proper.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that Summons be issued, and that upon a trial on the merits, Plaintiff be awarded the relief requested in this Complaint and such other and further relief to which he may be justly entitled.

> Respectfully submitted,
> WILEY WALSH, P.C.
>
> By: */s/ Colin Walsh*
> Colin Walsh
> Texas Bar No. 24079538
> *Board Certified Specialist, Texas Board of Legal Specialization, Labor and Employment Law*
>
> **WILEY WALSH, P.C.**
> 1011 San Jacinto Blvd., Ste. 401
> Austin, TX 78701
> Telephone: (512) 27-5527
> Facsimile: (512) 201-1263

colin@wileywalsh.com

Robert J. Wiley
Texas Bar No. 24013750
*Board Certified Specialist, Texas Board of Legal Specialization, Labor and Employment Law*

**ROB WILEY, P.C.**
2613 Thomas Ave
Dallas, Texas 75204
Telephone: (214) 528-6500
Facsimile: (214) 528-6511

**ATTORNEYS FOR PLAINTIFF**